Well, that's the reason. Okay, Mr. Bondaroff, you can come on up. Sam Bondaroff, III May it please the Court, my name is Sam Bondaroff. I'm here on behalf of the appellants. The appellant represents a putative class of current and former employees of Whole Foods Market. And this case turns on the application of the Supreme Court's pleading standard, announced in Fifth Third Bancorp v. Dudenhofer, which states that if you are bringing a claim for breach of the fiduciary duty of prudence against the fiduciary of an employee's stock option plan, you must propose that the defendant have taken an alternative action that would be consistent with the securities laws and would not have been viewed by a prudent fiduciary as more likely to harm plan participants. You say he should have gone to a hedge fund alternative, but I don't understand why that wouldn't have been equally under an order of disclosure. Your Honor is referring to the hedging product alternative. Yeah, what does that mean? The idea is that you take a certain amount of cash, the plan has a cash buffer in it, and you take a certain amount of the cash and you buy a product, you buy into a pool, which is a pool of usually U.S. Treasuries or something similar, and there's a bunch of other companies, similarly situated companies, that are also pooled in there. And if the stock then goes down for whatever reason, you are paid back, you are reimbursed out of that pool, and if it doesn't, then you get most of your money back minus a small fee. But the stock has rebound, correct, the Whole Foods stock? The Whole Foods stock, at the time of our filing of the complaint, the stock had not rebounded. The stock had, in fact, was trading at a lower price than it was at the time that we alleged the class period ended. But did any of your plaintiffs sell at the lower price? Well, Your Honor, our client has not sold. So there's not a damage loss? Well, actually, we contend that there is, Your Honor, enough certainly to confer standing in this case. Well, standing is fine. I'm talking about damages. Well, damages in an ERISA context can be measured by the amount by which they overpaid for the stock. And so even if the stock ultimately recovers, they still paid, as I think the Second Circuit put it, a price too dear for that stock. And so what they paid, so even if there's a full recovery down the line, they still are deprived of profits that they would have otherwise earned had they bought at an accurate price. And then for those who actually sold at the lower price, their damages are locked in. But both kinds of damages in the ERISA context are allowed to be pleaded. I want to focus, if I may, with the Court's indulgence, on the particular alternative action we've taken and the facts that we've alleged that distinguish this case from two cases that this Court has decided, Whitley v. BP and the Singh v. Radio Shack case. Because in both of those cases and in our case, you have an allegation that an employee's stock plan became artificially inflated due to misrepresentations made by the company, that the fiduciaries knew or should have known about that artificial inflation, and that the fiduciaries should have made a corrective disclosure or endeavored to have a corrective disclosure made before a disclosure was made. And what this Court held in Whitley and then reaffirmed in Singh is that under Dudenhofer, that's not enough to pass the Supreme Court's more harm than good test. Because a prudent fiduciary looking at that situation would say, well, if I make a corrective disclosure, there's going to be a stock price drop. After all, if it's artificially inflated, it has to come back to earth. And so if I correct it, there's going to be a stock price drop. That could harm the plan. Therefore, that's not enough. What we've done is we've alleged two unique facts to this case that we believe distinguish it from Whitley and from Singh. The first, and this is really the most important, is the fact that over the course of the class period here, throughout the class period, buyers of the artificially inflated stock were outpacing sellers of the artificially inflated stock. So imagine you're a prudent fiduciary. You're looking at this situation. You know the stock is inflated. You're thinking, should I make a corrective disclosure, which I know will cause a stock price drop? Well, how will that affect the people in the plan? The sellers, people who may sell in the future, are not going to like this because they've been selling at an inflated price and making a nice profit for themselves. That's good. They've been benefiting. But buyers, future buyers, they want the stock to come back to earth because they don't want to pay too dear a price for the stock. And then you have holders. And I think holders, it's kind of a wash because the stock goes up, the stock goes down. They don't really experience anything other than a paper loss or paper gain. Where holders are affected is in the second factor we've alleged, and that has to do with the stock price recovery time. So in this case, throughout the class period, what we've alleged is that buyers of the artificially inflated stock were outpacing sellers. There were more people buying than selling. If you're a prudent fiduciary. What case acknowledges this theory you're offering about the relative pace of buyers and sellers as controlling in this context? Well, Your Honor, we would argue that it is, that if under a fair interpretation of Dudenhofer, it would be controlling in this case because Dudenhofer asks you to look at, asks you to compare harm and good based on what will be the effect of a concomitant drop in the price of the stock if you make a correct disclosure. But you're now saying to the fiduciary that you make a choice of who's going to get the knife. And the fiduciary duty is owed to them all, buyers and sellers, isn't it? It is, Your Honor, but the Dudenhofer counsels us to do a, to see which will cause more harm than good to those people in the plan. Now, if you have people benefiting, if you have more sellers benefiting than buyers, then arguably you wouldn't want to make a corrective disclosure because more people you owe that duty to are benefiting from what's going on and will be hurt by what you might do than will be helped by it. But Dudenhofer suggests that you have to do some kind of balancing as a prudent fiduciary because otherwise if you, if any action you take might hurt one plan participant, even if it benefits all of the others, you'll never be able to take any action at all. And essentially that means that there is no duty of prudence for an ESOP fiduciary because any possible situation you could imagine, if that's enough to hold you back, then there is no duty of prudence. And Dudenhofer, the opinion, is largely concerned with reestablishing that ESOP fiduciaries also have to live by the prudent person standard and that a defense-friendly pleading presumption created by the judiciary, not found in the statute, is not appropriate. It would be strange for the Supreme Court to have spent so much of Dudenhofer saying what was called the munch presumption of prudence, which was created by the Third Circuit and then embraced by most of the other circuits in this Court over the course of 14 years. I want a fiduciary to balance out buyers and sellers. I mean, you're counting, you have a number of persons that are more people that are buying than people that are selling, but the question is what about the amounts that they're buying? You're talking about balancing out. That would mean you would have to know when they buy and what their price is and calculate all of that out. I don't know how you would do that, but I'm not sure it's admissible, even if it's acceptable to divide the fiduciary obligation that way. Well, actually, Your Honor, it is possible to do it based on the amount.  We've pleaded not based on technically the number of employees who bought and sold, but based on the amount by which they were. It's a duty, though, to the individuals, not to some mass group out there. Yes, Your Honor, but the best way, really the only feasible way to measure harm versus good is based on the overall financial impact to the plan. And it is possible for a planned fiduciary in real time, if their job is to monitor the purchases and sales and the investment opportunities in the plan, they can find out which is the trend. And if they look at that information and they determine that there's a lot more sales going on than purchases or even that it's a close question, one might say, well, then you haven't plausibly alleged an alternative action they should have taken. But here, where there's a clear gap and in real time they could determine that over the course of this multiyear class period, buyers are consistently buying more at artificially inflated prices than sellers are selling at those same prices. Those sellers that are being diminished here were at one time buyers by definition. Yes, Your Honor. It has to do with just the timing of when they purchased. So the preference, I don't know how to, I find that difficult. It may be that in this circumstance you can't take that question, whether you can take that action consistent with a fiduciary obligation without redefining what a fiduciary obligation is. We believe that you can, Your Honor. And, in fact, that it's important that a fiduciary who takes on what is supposed to be the highest duty known to the law has to do that hard work of determining which is an action I'm going to take more going to cause a net harm to the people I owe that duty to or is it going to be a net benefit to those people I owe that duty to. And if in this case they had looked at that information and considered it, they would have realized, a prudent fiduciary would realize, that the net benefit to prospective buyers at the artificially inflated price outweighs the net harm to prospective sellers that will result from a corrective disclosure. The district court talks about the fear of an overcorrection, but in practical experience the courts and the efficient markets theory don't really look at disclosure of public stocks in that way. Generally speaking, the theory is that if there's an artificial inflation of a stock, because there's been a misrepresentation, when the corrective disclosure comes out, however it comes out, it's going to diminish by roughly the amount by which it was artificially inflated due to the misrepresentation. Even if there's an overcorrection and it's brief, it usually evens out after some time. The concern here is that if you let it go on further, you're going to have more people buying at that inflated price than possibly selling or holding. And then the second factor which we've alleged and which is unique to this case, although the district court didn't see it that way, is that you have a corporate entity here, Whole Foods, that has made the centerpiece of its presentation to its customers and the public its trustworthiness. And at the same time, what it is guilty of is overcharging those same customers and concealing it from the public. That is why we have alleged in the complaint that when the stock price correction eventually occurred, it's not just that you had a drop, which is, you know, you have to consider is that a net harm or a net benefit, but you had a much slower than necessary recovery of the stock price due in part to the fact that a company whose entire reputation is about we are the good corporate citizen, you can trust us, we are honest with you, we don't lie to you, in a way that is much different from the way most companies present themselves, had lost some of that trustworthiness with the public because they delayed telling the truth about what they had been doing. In fact, it wasn't their choice to tell at all. They were essentially outed by regulatory agencies and the media. At that point in time, wasn't the investigation still going on in-house when they were outed? Well, Your Honor, our allegation is that the investigation of the regulatory commissions had already been concluded in California and had resulted in significant fine and finding of wrongdoing. The same is true in Albany, and that was in 2014, early 2015, and that the New York investigation was enough for the New York regulatory agency to announce that there had been widespread overcharging there as well and that a corporate defendant can always say about alleged wrongdoing, especially when a regulator is involved, well, we were still investigating, we weren't sure, but what we believe we plausibly alleged is that after years of being caught in their two biggest markets, California and New York, there was more than enough information in the hands of defendants to know that this was not just something they needed to further investigate. And, in fact, when they admitted what had happened, they even used the language of trust to describe why they had failed and why their stock price had felt a negative impact from the announcement. What do you do with it? Suppose the fiduciaries have information that is quite good. There's a real breakthrough in the product or whatever, and it's going to make a real splash. It's insider information. Now, they have a fiduciary duty to disclose that because if they don't disclose it, you're going to have people that are selling and they're going to lose money. And so you're going to go through your same analysis again. Well, Your Honor, if the information in question, if it's not known, if it's not certain, then you are in the situation. It's insider information, and they know that there's going to be a strike or a diamond find or whatever out there. They know what it is. Then no, Your Honor. But they're insiders. By my question, I assume they're insiders, which means they cannot go in and purchase on that basis themselves. Right. They can't make any purchases or sales based on that information. Now they're in an awkward situation, though, of disclosing insider information. Well, Your Honor, the two situations are different. I would say in the situation you're proposing they would have no obligation. No, that's different. I'm just talking to you about the difficulties of the – your theory is very creative. I mean, you're – I mean that and I'm not critical of it, but I'm just trying to understand the complexity of the fiduciary duties you're creating. Your Honor, I can just answer your question. Sure. You can get back to it and reply, I think. I will address it on rebuttal. Thank you. Mr. Casas. Thank you, Your Honors, and may it please the Court. Your Honors, the Whitley case was correctly decided. This case and this appeal are controlled by Whitley. The district court's decision is correctly decided in light of this court's opinion in Whitley. As a result, this court should affirm the district court. Indeed, the Whitley case immediately forecloses two out of the three arguments that Morton raises in his complaint. The first being early disclosure and the second being the halt in trading. As I will discuss, including the net purchaser argument that has been raised, these two alternatives can be dealt with very quickly and rejected very quickly. The third alternative, this purchase of a hedging product that is not fully described in the complaint. While that's not covered by Whitley, if you look at Dudenhofer, if you look at Amgen, and you look at the other hosts of cases across the country that have dealt with the pleading standard, this hedging product also falls because it doesn't satisfy the fifth-third standard. And I'll discuss the hedging product again in more detail, but for now I want to note that as the district court found, the purchase of the hedging product would have to be disclosed under ERISA in the plan's documents. Thus, disclosure could lead to a decline in the stock price, and given the chance of a decline in the stock price, this alternative fails. Your Honors, Morton has not plausibly alleged that the three alternatives set forth in the amended complaint were so clearly beneficial that the defendant fiduciaries here could not conclude that the alternatives would not be more likely to harm the fund than to help it. And as a result, this appeal should be dismissed. Counsel has raised some issues of fact, and so I do want to address those just briefly before I move on. Plus, it's also important to the client that a few things come out. First of all, with regard to the argument of trustworthiness, of course Whole Foods maintains a level of trust with its clients and with its customers. That has not been eroded here, and the trustworthiness is not distinguishable from Whitley. It's not distinguishable from Radio Shack or from In re Lehman or from any other cases that have come before the various courts across the country. Trustworthiness is what every company wants to project to its customer and project to the public. So that issue right off the bat can be disregarded. But Morton's amended complaint does not allege any statement, action, or omission by any of the defendant fiduciaries to show that a scheme or some sort of conspiracy actually existed to mislead the customers or the public. Morton alleges no actual inside information with specificity that the defendant fiduciaries did not disclose. From the defendant fiduciaries' perspective, nothing about the DCA investigation should have caused any of them to take the action set forth in the amended complaint. And the record does not establish that the defendant fiduciaries' consistent denial of any wrongdoing was incorrect. And counsel has just raised the issue of the California investigation, this Albany investigation, and the New York DCA investigation. Importantly, California and Albany were years before the New York DCA investigation was brought to light by a one-sided press release by the New York Department of Consumer Affairs. California and Albany were public. As a matter of fact, the president of the California region published a letter to the public describing the California investigation and describing the results. This was public, and it was more than two years before the New York DCA investigation. And so any impact, potential impact of that investigation, should already have been reflected in the stock's price. So effectively, we can ignore California. And because Albany was public as well, we can ignore that as well because the law presumes that the efficient market has already determined what the stock's price should be. But what we have in the amended complaint is we have reference to California, we have reference to Albany, and then we have legal conclusions and we have speculation. And the speculation and legal conclusion doesn't survive Twombly and Iqbal, let alone Fifth Third and Whitley. That said, and I appreciate the Court's indulgence in talking about the facts here, but the district court's opinion doesn't include all those additional facts. So this Court need not go beyond the four corners of the district court's order to affirm the dismissal of Martone's claims. The facts in the amended complaint do not establish an alternative course of action that satisfies Dudenhofer. And I apologize, sometimes I say Dudenhofer and sometimes I say Fifth Third. I mean the same case, of course. It doesn't satisfy Dudenhofer, Amzin, or Whitley. In its brief, Martone argues that the Fifth Third standard as applied by the Court is too high and that is not what the Supreme Court intended when it decided Fifth Third. This is incorrect. Whitley is correctly decided based upon Dudenhofer, and Judge Pittman, as I mentioned earlier, at the district court level applied Whitman properly and also applied the Fifth Third pleading standard. And then cases such as Somner in the Sixth Circuit and then Reinhardt in the Second have addressed how high the standard is. And they agreed it's high, but they also agreed it's high for a reason. The reason behind this high burden is Congress's desire to encourage the creation of ESOPs in light of ERISA's general duties of prudence and then also still ensuring that the fiduciaries comply with the federal securities laws and then also overlaying that would be the standing issues put forth by Congress in the PSLRA from a securities law perspective. Congress recognized that insiders would indeed have inside information and they would also be fiduciaries wearing two hats. As insiders, these fiduciaries would have access to information that they could not act on without violating the securities laws. Congress also did not want to create a system where fund participants had more rights than ordinary investors did, and that's the tension between the securities laws and the PSLRA and these kinds of ESOP stop-draw cases. Stop-draw cases in the ESOP context are no more, and this is important, I think, that ESOP stop-draw cases are no more than just an end run around the PSLRA. And the Munch presumption addressed that end run, but then the Supreme Court in Dudenhofer clarified and repackaged that standard, that burden, and made it into a pleading standard, but it did not lessen at all, I'm sorry, did not lessen at all the burden the plaintiff must meet in order to remain in court. So such a high standard recognizes the social policies behind the creation of ESOPs and also protects the fund from meritless suits and unneeded defense costs. Absent a plausible alternative set forth with specific facts that is so clearly beneficial that a reasonable fiduciary could not conclude that it would not do more harm than good, an ESOP stop-draw case should be dismissed and the attempted end run around the PSLRA should not be allowed. Your Honors, early disclosure and then the halt in trading, those two alternatives, like I said when I started my argument, Whitley clearly takes care of those issues. If there is a potential that a fiduciary could conclude that early disclosure or a halt in trading would result in a drop in the stock's value, then the fiduciary is not obligated to take those alternatives and cannot be held accountable for not acting. Now, counsel has raised this idea of a net purchaser. This is just window dressing. It doesn't change the standard. It doesn't change the impact of the decision of the fiduciary. Martone sets forth no specific facts in his amended complaint to support his claim that early disclosure would be helpful and would not still result in a lower stock price. As a matter of fact, I believe they admit that the potential is there for a lower stock price. Well, that admission by itself is enough to say that a fiduciary need not take that action because at the end of the day the fiduciary must protect the fund as much as possible. Second, Martone assumes that a fiduciary has the ability to determine at any particular point in time whether the fund is a net purchaser or a net seller. And I believe, as Judge Pittman said, the fiduciary is not required to be prescient. It's just prudent. And so the fiduciary only knows what is available at a particular point in time and then must act in the best way possible to protect the fund. And so we still don't understand from the amended complaint or from the counsel's briefs how it is that a fiduciary is supposed to determine on any particular day whether a fund is a net purchaser or a net seller. In any event, you still have the opportunity or the obligation, rather, of the fiduciary to examine whether early disclosure would impact the fund and cause the stock price to go down not only for the fund itself but for the actual shareholders and the stock price as a whole. And I believe Judge Higginbotham raised this issue. The logical flip side of the net purchaser argument is that a fiduciary then would have to, from a net seller side, remain quiet and not issue any disclosure at all. And so while this might be helpful to the fund, what this actually could necessarily constitute is a securities level violation because at that point then the fiduciary is making a determination based upon net purchaser information or net seller information which he can then manipulate the stock price without actually making a disclosure to anybody, simply making a disclosure to the general public. And so he's acting on inside information to the detriment of the market as a whole. Fourth, the district court properly found that early disclosure gives rise to the same concerns as regular disclosure, and that's a risk of loss to the stock price. Accordingly, Martone's net purchaser argument does not distinguish this case from Whitley or from Radio Shack or from any of the other cases that have been decided across the country, and it should be rejected. I do want to turn to the hedging product. Now, and I believe Judge Clement, you asked what does that mean? What is a hedging product? Well, the amended complaint doesn't give us very many clues. Let's assume, though, that it is described for purposes of this argument in such a way that a fiduciary might want to consider it. Well, it still must be disclosed. The diversion of monies into a hedging product, and as the district court considered on its own and its own analysis of ERISA and the related regulations as well as the plan documents here for Whole Foods' 401k plan, does require that the fiduciary, if it's going to invest in a hedging product, must make the participants aware that this is going on. Well, as soon as that disclosure occurs, that is going to potentially cause concern among the participants. Why? Why are you doing this? What's wrong with the company? What's wrong with the stock? And that's going to bleed out into the market as a whole. So the disclosure of the hedging product as it is, is going to cause a stock drop I'm sorry, a drop in the stock price. Now, Martone does raise the issue of whether a hedging product purchase needs to be disclosed. And I think if you look at the applicable statutes, ERISA 404, 29 CFR section 2550.404a, and there's a whole list of other regulations and statutes, and Judge Pittman cites those in his order, that points you to the conclusion that there's no other reasonable alternative but that it is necessary to disclose this hedging product. I think the hedging product falls or fails, rather, for some other reasons. One is that Martone fails to acknowledge that any offeror of a hedging product is going to want the purchaser to represent that it is unaware of any materially adverse information that has not been disclosed. So if the fiduciary does not disclose to the offeror, then the fiduciary is then committing fraud. And that's not what is obligated under Fifth Third or under Amgen or under Whitley. And then failure to disclose the purchase could be a securities violation in and of itself, because at that point the fiduciary is then acting on inside information without telling the general public. So we have a situation where if the fiduciary decides to disclose, the stock could go down. If he does not disclose, then he's committing a securities loss violation. So it's a Hobson's choice, and that's why the hedging product on its face does not survive. And then finally, the hedging product, and this is raised, I believe, in counsel's brief, but the other courts who have considered it have discussed this. The hedging product, even if it's purchased early, even if it's done many, many years ahead of any potential causes of concern, the hedging product at that point becomes diversification. And ERISA does not require a court to – I'm sorry. ERISA does not require a fiduciary to actually diversify the funds that are available. And indeed, if the hedging product is found to be acceptable, an acceptable alternative, it becomes a de facto standard, meaning that every fiduciary would then run out right away and purchase hedging products in order to keep from being sued. Well, then that becomes, although not required by statute, it requires – it becomes required by judicial fiat. And so that's not what ERISA requires. As a matter of fact, ERISA specifically says that diversification is not required. So, Your Honors, Martone has not set forth any alternatives with specificity here that so clearly – that are so clearly beneficial that a reasonable fiduciary could not conclude that such an action would not be likely to cause more harm to the fund than to help it. The case law is clear that early disclosure, the halting in trading, net purchaser allegations that it even included, that investing in a hedging product, none of the alternatives pass this test. Accordingly, under Dudenhofer and Amgen and under Whitley and RadioShack, as well as the precedent from the Sixth and Second Circuits, this Court should affirm the district court's dismissal order. Thank you, Your Honors. Mr. Bondaroff, you've saved time for rebuttal. Your Honors, Dudenhofer states that the Court is supposed to act as a gatekeeper with these cases. Justice Breyer's opinion says that there are – you need to be able to separate the plausible sheep from the meritless goats. One thing that's implied by that is that there are still supposed to be sheep out there. Not every case is a goat. But if the standard exclusively for how we judge these cases is that, well, if a fiduciary might be worried about a stock price drop by taking an action, that's enough, then it's game over for all of these claims. Because all of these claims are based on the idea that the stock is trading at an artificially inflated level. You cannot correct artificial inflation of stock without bringing the stock down. If that's the end of the more harm than good analysis, if it stops right there and we don't consider any other factors like whether there are more purchases than sales, then we're not performing a gatekeeper function anymore. We're putting up a wall. And, you know, counsel – and I've heard this argument in a number of places that this is concocted to be an end run around the PSLRA. There is nothing in any case, Dudenhofer or otherwise, from the Supreme Court that suggests that they view these claims that way. Dudenhofer is concerned with reminding us that even ESOP fiduciaries, as much as Congress wanted to encourage their creation, wanted to hold them to the same standard of prudence as every other ERISA fiduciary. If we look at the factor of buyers versus sellers, if we look at the risk of about the recovery of the stock price from the drop, in addition to looking at the stock price drop, if we consider all those factors, the district courts can still perform that gatekeeper function. It's not going to let all the cases in, which I know is a concern that Dudenhofer expresses. That's not going to happen because there are going to be plenty of opportunities, plenty of situations where the sellers are outnumbering the buyers or are selling more than they're buying, and therefore they don't pass muster. Plenty of opportunities where you can't adequately and plausibly allege that the stock price recovery was going to be slower than it should have been. There will be situations where you cannot allege that the fiduciaries in question knew or should have known about the artificial inflation of the stock. But, again, if we simply abandon all of that, if we take Whitley, which did not have before it these other factors, particularly buyers versus sellers, was not before the court in this case, if we take all those off the table and say that all that matters is the stock price drop, that's all a prudent fiduciary needs to worry about, we are giving those fiduciaries immunity. Imagine Enron. In that situation, according to what appellees have said, an Enron fiduciary, knowing that the company is a fraud, would still be okay with not doing anything because disclosing that Enron is a fraud would cause Enron's stock price to drop. That's a perverse result, and there is nothing in Dudenhoffer or Amgen or any other case that suggests that that is what the Supreme Court wanted this to be. If we don't like the fact that this claim exists, we have to take it up with Congress because the claim of prudence against fiduciaries of ESOPs, it's in the statute. It is not something that the courts can simply wipe out with an impossible pleading standard. Finally, to get back to Judge Higginbotham's question from earlier, a fiduciary is not obligated to go above and beyond and to create profit-making opportunities for planned participants. They are obligated to try to prevent harm to those planned participants, and that is a critical difference between the two situations described. Finally, with respect to the hedging claim, our point is the district court, in looking at that, made a lot of inferences about whether that hedging product would need to be disclosed to planned participants, and then on top of that, whether that would therefore make it public information, and whether that would therefore cause the stock price to drop. That is a lot of factual inferences being done in favor of the defendant. It is at least equally plausible, given the language of the plan and the language of the ERISA statute, that that product would not need to be disclosed to planned participants, and therefore would not become public and would not cause the stock price to drop. For these reasons, we ask that the opinion of the district court be reversed and remanded. Thank you. Roberts. Thank you. I'll now draw up the cases under submission.